<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

J.S. on behalf of B.S., et al.,

                Plaintiffs,

           v.

GREEN BROOK TOWNSHIP PUBLIC
SCHOOL DISTRICT,

                Defendant.

Civil Action No. 19-18691 (MAS) (ZNQ)

**MEMORANDUM OPINION**

## SHIPP, District Judge

This matter comes before the Court upon cross-motions for summary judgment. The first is Plaintiffs J.S. and J.S.'s ("Plaintiffs") Motion for Summary Judgment on behalf of B.S., their minor child. (ECF No. 25.) The second is Defendant Green Brook Township Public School District's ("Defendant" or the "District") Motion for Summary Judgment (ECF No. 27), which Plaintiffs opposed (ECF No. 29). The Court has carefully considered the parties' submissions and decides the matter without oral argument pursuant to Local Civil Rule 78.1. For the reasons set forth below, Defendant's Motion for Summary Judgment is granted, and Plaintiffs' Motion for Summary Judgment is denied.

## I. BACKGROUND

### A. Overview of the Individuals with Disabilities Education Act

Through the Individuals with Disabilities Education Act ("IDEA"), the federal government provides funding to assist states with educating disabled children living within their borders. *See* 20 U.S.C. §§ 1400, *et. seq.*; *see also Blunt v. Lower Merion Sch. Dist.*, 767 F.3d 247, 267 (3d

Cir. 2014). States receiving these funds must adopt a set of policies and procedures meant to guarantee all disabled children receive a free appropriate public education ("FAPE"). 20 U.S.C. §§ 1412(a), 1413(a); *see also Blunt*, 767 F.3d at 267–68. Required FAPE policies include the "child find" obligation. 20 U.S.C. § 1412(a)(3); 34 C.F.R. §300.111. Under the child find obligation, "[e]ach public school district in a state that accepts federal funds under [the] IDEA has a continuing obligation . . . to identify and evaluate all students reasonably believed to have a disability . . . ." *Blunt*, 767 F.3d at 267 (citing *Ridley Sch. Dist. v. M.R.*, 680 F.3d 260, 271 (3d Cir. 2012)). New Jersey has enacted statutes and regulations to satisfy its obligations under the IDEA, *see* N.J. Admin. Code §§ 6A:14, *et seq.*, including designating the New Jersey Office of Administrative Law ("OAL") to hear special education complaints, N.J. Admin. Code § 6A:14-2.7.

"Under the IDEA, school districts must work with parents to design an [Individualized Education Program ('IEP')], which is a program of individualized instruction for each special education student." *Ridley*, 680 F.3d at 269 (citing 20 U.S.C. §§ 1412(a)(4), 1414(d)). An "IEP must include an assessment of the child's current educational performance, must articulate measurable educational goals, and must specify the nature of the special services that the school will provide." *Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 53 (2005) (citing 20 U.S.C. § 1414 (d)(1)(A)). Although it must provide students with a "basic floor of opportunity," the IEP "does not have to provide 'the optimal level of services,' or incorporate every program requested by the child's parents." *Ridley*, 680 F.3d at 269 (quoting *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010)). Rather, an IEP must, at a minimum, "be reasonably calculated to enable the child to receive meaningful educational benefits in light of the student's intellectual potential and individual abilities." *Id.* (internal quotation marks and citations omitted).

"If parents believe that an IEP fails to provide their child with a FAPE, they may request an administrative 'impartial due process hearing,' as may a school district if it wants to change an existing IEP or seeks an evaluation without the parents' consent." *Blunt*, 767 F.3d at 269 (quoting *Ridley*, 680 F.3d at 269–70); *see also* 20 U.S.C. § 1415(f). Such due process decisions by an administrative law judge ("ALJ") are final, 20 U.S.C. § 1415(i)(1)(A); 34 C.F.R. § 300.514(a), and are appealable by bringing a civil action in "any State court of competent jurisdiction or in a district court of the United States, without regard to the amount in controversy," 20 U.S.C. § 1415(i)(2)(A); *see also* 34 C.F.R. § 300.516(a).

## B.   Factual Background

The parties are familiar with the factual and procedural history of this matter. The Court, therefore, recites only those facts necessary to resolve the instant motions. Plaintiffs are the parents of B.S., a minor child who attended school within the District from 2013 to 2018. (Pls.' Statement of Undisputed Material Facts ("PSUMF") ¶ 1, ECF No. 25-2; ALJ Op. 1–2, 125, ECF No. 1-1.) At age five, B.S. was diagnosed with attention deficit hyperactivity disorder ("ADHD") and prescribed medication. (PSUMF ¶¶ 6–7; Def.'s Statement of Undisputed Material Facts ("DSUMF") ¶ 12, ECF No. 27-1; ALJ Op. 125.) In 2013, prior to B.S. entering kindergarten, Plaintiff J.S. ("B.S.'s Mother") requested accommodations for B.S. based upon his ADHD diagnosis.[1] (PSUMF ¶¶ 9–10; DSUMF ¶ 12; ALJ Op. 125.) Officials, however, advised B.S.'s

---

[1] Specifically, B.S.'s Mother requested that the District implement a "504 Plan" on B.S.'s behalf. (PSUMF ¶¶ 9–10; DSUMF ¶ 12.) Under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving [f]ederal financial assistance . . . ." A 504 Plan "is a plan developed to ensure that a child who has a disability . . . receives accommodations that will ensure their academic success and access to the learning environment." *K.E. v. N. Highlands Reg'l Bd. of Educ.*, No. 18-12617, 2019 WL 5617788, at *2 n.2 (D.N.J. Oct. 30, 2019) (citation omitted). "The IDEA process is more involved than that of Section 504 . . . and requires documentation of measurable growth." *Id.*

3

Mother that the District's general practice was "to wait until a child started attending school to determine how the child was functioning in the classroom before implementing a 504 [P]lan." (DSUMF ¶ 12; *see also* PSUMF ¶ 10; ALJ Op. 3, 125.) Notwithstanding this practice and prior to any special education evaluations or determinations, the District informed B.S.'s Mother that several of the accommodations—such as preferential seating and verbal redirection—could "easily [be] provide[d] . . . without a 504 [P]lan in place because they did not require 'heavy lifting.'" (DSUMF ¶ 13; *see also* ALJ Op. 3, 125.) Accordingly, a 504 Plan was not implemented at that time. Prior to B.S.'s first grade year in 2014-2015, Plaintiffs reached out to the District with concerns about B.S.'s social development and requested a Child Study Team ("CST") evaluation to determine B.S.'s "unique strengths and weaknesses." (PSUMF ¶¶ 12-13; DSUMF ¶ 14, ALJ Op. 3-4, 125.) In the alternative, Plaintiffs requested a 504 Plan based upon B.S.'s diagnosis. (PSUMF ¶ 13.) Again, a 504 Plan was not implemented at that time. Importantly, however, there were no academic, social, or disciplinary issues raised regarding B.S. during his kindergarten and first grade years. (ALJ Op. 125 ("From all reports, B.S. was an amiable and bright little boy who was progressing satisfactorily.").)

"At the end of first grade, at the request of [Plaintiffs] and upon receipt of supporting medical documentation . . . , the [District's] 504 Committee met for an eligibility determination which resulted in the development of a 504 Plan for implementation in the 2015-2016 school year (second grade)." (*Id.*; *see also id.* at 126; PSUMF ¶¶ 16-18 (noting that evaluations by B.S.'s doctors "contained diagnoses of ADHD and possible [autism spectrum disorder ('ASD')]"); DSUMF ¶¶ 15-20.) For his second grade year, B.S. was afforded the following 504 Plan accommodations: proximal seating, lesson presentation using multi-sensory approach, use of Google to write, behavior management, free movement, small group instruction, and standardized testing accommodations. (DSUMF ¶ 18; *see also* PSUMF ¶¶ 21-24; ALJ Op. 4, 126.) The 504

4

Plan was revised for B.S.'s third grade year, and included the following accommodations: proximal seating, "talk to text" technology for keyboarding, group testing for standardized testing, social skills, and behavior management. (DSUMF ¶¶ 22–23; ALJ Op. 4, 127; *see also* PSUMF ¶ 25.)

Up until his third grade year, B.S. "was not receiving any special education or related services as he had a 504 [P]lan." (DSUMF ¶ 27; *see also* PSUMF ¶¶ 27, 44.) "Because[, however,] his needs [at that time] were greater than what a 504 [P]lan could address, B.S. was evaluated for further services." (DSUMF ¶ 27; *see also* PSUMF ¶¶ 27, 32.) In April 2017, following the evaluations, "the CST determined that B.S. was eligible for special education and related services under the classification of 'Other Health Impaired.'" (ALJ Op. 130; *see also* DSUMF ¶ 34; PSUMF ¶ 44.) B.S. was provided with an IEP which included the following accommodations: in-class resource support, flexibility to receive small group or individualized instruction, twice-a-week supplementary instruction, speech and language therapy, occupational therapy, and a social skills group. (DSUMF ¶¶ 34–36; *see also* ALJ Op. 130–31; PSUMF ¶¶ 49–50.)

After the IEP had been in place for over a year and at the end of B.S.'s fourth grade year, Plaintiffs, their counsel, B.S.'s teachers, and the District's counsel met and reviewed B.S.'s progress. (DSUMF ¶ 41; PSUMF ¶ 53; ALJ Op. 132.) The District determined that, "based on the progress his teachers reported, an in-class support program similar to the one he received in fourth grade would be appropriate for fifth grade." (DSUMF ¶ 41; *see also* PSUMF ¶ 53; ALJ Op. 132.) "In the proposed IEP [for 2018], B.S. was still provided with occupational therapy once a month[,]" in-class support, speech and language therapy, and a social skills program. (DSUMF ¶¶ 42–44; *see also* ALJ Op. 132–33.) Plaintiffs, however, refused to consent to the IEP and in September 2018 unilaterally placed B.S. in a different school—the Flex School—for his fifth grade year. (DSUMF ¶ 50; PSUMF ¶ 54; ALJ Op. 133.)

5

On May 21, 2018, prior to their placement of B.S. into the Flex School, Plaintiffs filed a due process petition in the OAL. (DSUMF ¶ 5; PSUMF ¶ 55; ALJ Op. 2.) In that petition, Plaintiffs asserted that the District failed to timely identify B.S. as eligible for special education services, and once they did, failed to offer him an IEP that delivered a FAPE. (ALJ Op. 1–2.) Accordingly, Plaintiffs sought reimbursement for B.S.'s placement at the Flex School, as well as for compensatory education. (*Id.* at 2.) A hearing was conducted on February 20, 2019, February 26, 2019, February 27, 2019, March 25, 2019, April 8, 2019, April 9, 2019, April 10, 2019, May 7, 2019, and May 21, 2019. (*Id.*) The ALJ heard testimony from the following individuals on behalf of the District: (1) Shaune A. Casazza, guidance counselor and 504 Plan Coordinator, (2) Bernadette Szenasy, Learning Disability Teacher Consultant and case manager, (3) Meghan Deutsch, school psychologist and behaviorist, (4) Michelle Ritter-Lodato, occupational therapist, (5) Amy Berger, speech-language specialist, (6) Linda Flora, reading specialist, and (7) Jennifer Stetz, a kindergarten special education teacher and academic enrichment teacher. (*See generally id.* at 2–33.) On behalf of Plaintiffs, the ALJ heard testimony from: (1) Dr. Theodore A. Petti, B.S.'s psychiatrist, (2) Tatyana Elleseff, speech language pathologist, (3) Shiela Smith-Allen, occupational therapist, (4) Thomas Gavor, head of the Flex School and certified social worker, (5) Dr. Erik Dranoff, licensed psychologist, and (6) B.S.'s Mother. (*See generally id.* at 33–119.)

Based on the documentary evidence and after weighing the credibility of each testifying witness, the ALJ determined that the 2018 IEP proposed by the District for B.S.'s fifth grade year constituted a FAPE under the IDEA. (*Id.* at 136–39.) According to the ALJ, "[a] review of the evidence reveals that B.S. steadily progressed in his educational program, and that the CST regularly monitored and adjusted his program in an ongoing effort to personalize his instruction and address his educational needs." (*Id.* at 136.) Furthermore, the ALJ rejected Plaintiffs' argument that the District failed to meet its obligations under the IDEA to timely identify B.S. as a special

6

education student. (*Id.* at 139–141.) The ALJ held that, "[a]t all times, the District was responsive and acted appropriately[,]" and, accordingly, "met its 'child find' obligations [as] set forth in the IDEA[.]" (*Id.* at 141.) In light of her findings, the ALJ concluded that Plaintiffs were not entitled to reimbursement for B.S.'s placement in the Flex School or for the costs incurred for their experts' evaluations "prior to B.S.'s referral to the CST." (*Id.* at 139, 141.) Importantly, in reaching her decision, the ALJ noted that several of Plaintiffs' witnesses were elusive, conclusory, and not credible. (*See generally id.* at 120–124.) Conversely, the ALJ concluded that the District's witnesses "all testified credibly" and were familiar with B.S. and the case's facts. (*Id.* at 124.) According to the ALJ, "[t]he detailed testimony of B.S.'s teachers who personally worked with [B.S.] and routinely observed [him] from kindergarten through fourth grade was especially persuasive as they are all educational experts in delivering special instruction to children with disabilities." (*Id.*)

Following the ALJ decision, Plaintiffs filed a Complaint in this Court seeking a reversal of the ALJ's decision pursuant to 20 U.S.C. § 1415(i). (*See generally* Compl., ECF No. 1.) On April 17, 2020, Plaintiffs filed their instant Motion for Summary Judgment, requesting the Court reverse the ALJ's decision. (ECF No. 25.) Plaintiffs also request that the Court order the District "to take financial responsibility for B.S.'[s] placement" at the Flex School. (*Id.*) On May 8, 2020, the District filed its instant Motion for Summary Judgment requesting the Court dismiss Plaintiffs' Complaint and affirm the ALJ's decision. (ECF No. 27.)

## II.     LEGAL STANDARD

"Where no new evidence has been presented to the Court, motions for summary judgment in an IDEA case are the procedural vehicle for asking the judge to decide the case based on the administrative record." *K.H. ex rel. B.Y. v. N. Hunterdon-Voorhees Reg'l High Sch.*, No. 05-4925, 2006 WL 2331106, at *4 (D.N.J. Aug. 10, 2006). Furthermore, "[t]he standard of review under

7

which this Court considers an appeal of a[n ALJ] decision under the IDEA differs from that governing the typical review of summary judgment." *M.A. ex rel. G.A. v. Voorhees Twp. Bd. of Educ.*, 202 F. Supp. 2d 345, 359 (D.N.J. 2002), *aff'd*, 65 F. App'x 404 (3d Cir. 2003) (internal quotation marks and citation omitted). The parties' motions, therefore, "[a]lthough framed as . . . motion[s] for summary judgment, . . . [are] actually . . . appeal[s] of the ALJ's ruling," *G.S. v. Cranbury Twp. Bd. of Educ.*, No. 10-774, 2011 WL 1584321, at *8 (D.N.J. Apr. 26, 2011), and the Court will "essentially conduct[] a bench trial based on a stipulated record[,]" *M.S. v. Mullica Twp. Bd. of Educ.*, 485 F. Supp. 2d 555, 566 (D.N.J. 2007).

"When deciding an IDEA case, the District Court applies a modified version of *de novo* review and is required to give due weight to the factual findings of the ALJ." *L.E. v. Ramsey Bd. of Educ.*, 435 F.3d 384, 389 (3d Cir. 2006). "Factual findings from the administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why." *Bayonne*, 602 F.3d at 563 (internal quotation marks omitted) (citing *P.P ex rel. Michael P. v. W. Chester Area Sch. Dist.*, 585 F.3d 727, 734 (3d Cir. 2009)). An ALJ's legal determinations, on the other hand, are reviewed *de novo. Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1064 (D.N.J. 2011). "Applying these standards, the district court may make findings 'based on the preponderance of the evidence and grant the relief it deems appropriate, including an award of attorney's fees, a requirement for reimbursement for a private educational placement, and a direction for the provision of a compensatory education.'" *Id.* (quoting *Bayonne*, 602 F.3d at 564).

## III.    DISCUSSION

### A.    The District's Child Find Obligations

Plaintiffs argue that despite ample and repeated notice of B.S.'s diagnoses and needs, the District failed to identify B.S. as a special education student as required under the IDEA. (Pls.'

8

Moving Br. 14, ECF No. 25-1.) Specifically, Plaintiffs point to the following examples of the District's alleged failures: (1) prior to kindergarten, Plaintiffs requested the District make accommodations for B.S., "including preferential seating, occasional breaks as allowed, and verbal redirection" because of "multiple disabilities that would have implications for his learning and functioning in the classroom[,]" (*id.* at 15–16); (2) prior to first grade, Plaintiffs requested a CST evaluation, and during the school year, teachers identified classroom difficulties, (*id.* at 17, 19–20); (3) in second grade, recommendations from B.S.'s doctors indicated that further assistance—in addition to the initial 504 Plan—should be provided, (*id.* at 20–21); and (4) in the third grade, B.S. failed to make progress and Plaintiffs' expert evaluations recommended additional accommodations, (*id.* at 22–27). According to Plaintiffs, "[i]n the face of overwhelming evidence that the [District] ignored, for years, the alarm sounded by its own staff, Plaintiffs' medical and educational professionals, and the Plaintiffs themselves," the Court should find that "the ALJ's finding that the [District] met its [c]hild [f]ind obligations was error [that] should be reversed." (*Id.* at 27.)

The District, on the other hand, maintains it did not violate its child find obligations because it was responsive and appropriate throughout B.S.'s time in the District. (*See generally* Def.'s Moving Br. 28–33, ECF No. 27-2.) Specifically, the District notes that, despite Plaintiffs' assertions, B.S. displayed no academic or social issues that would have triggered the need for a 504 Plan or an IEP. (*Id.* at 32.) Furthermore, upon recommendations made by B.S.'s doctors—and not based upon the District staff's findings—the District implemented a 504 Plan with several accommodations, including accommodations recommended by B.S.'s doctors. (*Id.* at 30–31.) Once B.S.'s "needs were greater than what a 504 [P]lan could address, B.S. was evaluated for further services." (*Id.* at 31–32.) According to the District, the ALJ—after reviewing testimony and evidence—"appropriately concluded that the District was responsive and acted appropriately

relative to B.S.'s education, and there was no evidence presented to the contrary that supports Plaintiffs' position that the District violated its [child find] obligations." (*Id.* at 33 (internal quotation marks omitted).)

"School districts have a continuing obligation under the IDEA and § 504 to identify and evaluate all students who are reasonably suspected of having a disability under the statutes." *W. Chester*, 585 F.3d at 738. "A school's failure to comply with [c]hild [f]ind [obligations] may constitute a procedural violation of the IDEA." *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 249 (3d Cir. 2012) (citation omitted). Child find, however, does not require schools to conduct a "formal evaluation of every struggling student." *Id.* Instead, courts have "infer[red] a requirement that [schools identify disabled children] within a reasonable time after school officials are on notice of behavior that is likely to indicate a disability." *Id.* at 250 (quoting *Ridley*, 680 F.3d at 271). "Obviously the case against the school district will be stronger if the district actually knew of the educational deficiency or the parents had complained." *M.C. ex rel. J.C. v. Cent. Reg'l Sch. Dist.*, 81 F.3d 389, 397 (3d Cir. 1996). "[Ultimately, however], it is the responsibility of the child's teachers, therapists, and administrators—and of the multi-disciplinary team that annually evaluates the student's progress—to ascertain the child's educational needs, respond to deficiencies, and place him or her accordingly." *Id.*

Here, the ALJ held that the District met its child find obligations under the IDEA. The ALJ found that "B.S. progressed in kindergarten and first grade[,] and had no academic or social issues that would have triggered the need for a 504 Plan." (ALJ Op. 140.) Furthermore, once it received additional requests from Plaintiffs and further medical documentation, the District implemented a 504 Plan that remained in place through B.S.'s second grade year and most of his third grade year. (*Id.*) During this time, B.S. was "routinely observed . . . to ensure that he was receiving the accommodations outlined in his 504 Plan." (*Id.* at 126.) Finally, upon Plaintiffs' December 2016

10

request that B.S. be referred to the CST for evaluations, the District conducted the requested evaluations and immediately implemented an IEP in 2017. (*Id.* at 140.) Following the implementation of the IEP, the District set goals for B.S. and evaluated his educational progress. (*Id.* at 131–33.) Accordingly, the ALJ held that, "[a]t all times, the District was responsive and acted appropriately[,]" and met its child find obligations under the IDEA. (*Id.* at 141.)

The Court finds that the ALJ correctly held there was no child find violation and affirms her decision on this ground. The Third Circuit's decision in *D.K. v. Abington School District*, 696 F.3d 233 (3d Cir. 2012), is instructive. There, a minor child diagnosed with ADHD was afforded behavioral plans, a social skills group, extra help in math and reading, and other measures from kindergarten through second grade. *Id.* at 240–41. While the child's parents claimed he continued to struggle despite these accommodations, the school district maintained that he was making "considerable progress." *Id.* at 241. Prior to the child's third grade year, the parents requested a "second, more comprehensive evaluation[,]" which ultimately "determined that [the child] was eligible for special education services as a student with 'other health impairment[.]'" *Id.* at 242. The school district offered the child an IEP based on these evaluations, but the parents instead filed a due process petition and requested an award for compensatory education. *Id.* The Third Circuit held that the school district "was not required to jump to the conclusion that [the child's] misbehavior denoted a disability or disorder because hyperactivity, difficulty following instructions, and tantrums are not atypical during early primary school years." *Id.* at 251. Furthermore, the court held that "the measures the [s]chool [d]istrict did take to assist [the child] in the classroom militate against finding a [c]hild [f]ind violation." *Id.* at 252 ("His teachers did not neglect his difficulties. Far from it, they and other . . . faculty took proactive steps to afford him extra assistance and worked closely with his parents to maximize his potential for improvement."). According to the court, "[i]t would be wrong to conclude that the [s]chool

[d]istrict failed to identify [the child] as a challenged student when it offered him substantial accommodations, special instructions, additional time to complete assignments, and one-on-one and specialist attention en route to eventually finding a disability." *Id.* Ultimately, the Third Circuit held:

> [S]chools need not rush to judgment or immediately evaluate every student exhibiting below-average capabilities, especially at a time when young children are developing at different speeds and acclimating to the school environment. Moreover, neither the failure to employ a functional behavioral assessment nor a subsequent disability finding is per se indicative of an inappropriate evaluation. The [s]chool [d]istrict did not breach its [c]hild [f]ind duty by failing to test [the child] until April 2006, during his first-grade year, or by declining to label him disabled under the IDEA until his second-grade year.

*Id.*

Here, B.S. demonstrated no academic issues, social concerns, or disciplinary problems in kindergarten or first grade. (ALJ Op. 125.) In fact, according to the District's 504 Coordinator, B.S. "was a very amiable bright little boy." (*Id.* at 3–4; *see also id.* at 125.) Despite the lack of classroom issues, the District implemented a 504 Plan for B.S.'s second grade year that included several accommodations recommended by B.S.'s doctors.[2] (*Id.* at 4, 125–26.) This plan was revisited and amended to add additional accommodations, even though based upon a teacher evaluation, "it did not appear that B.S.'s disability was significantly impacting him in the classroom." (*Id.* at 4; *see also id.* at 127.) Furthermore, District faculty "routinely checked with B.S.'s teachers to ensure that the 504 Plan was implemented." (*Id.* at 4.) Finally, following another request by Plaintiffs that B.S. be evaluated by the CST, the District evaluated B.S. and

---

[2] According to the District's witness Ms. Casazza, "the 504 Plan was put in place because the parents were insistent that he required one." (ALJ Op. 5.) "According to [Ms.] Casazza, B.S.'s teachers did not believe that he required a 504 Plan because he was functioning well in the classroom and never had any significant issues." (*Id.* at 4.) As stated above, the ALJ found that the District's witnesses all testified credibly and persuasively. (*Id.* at 124.)

12

implemented an IEP under the classification of "Other Health Impaired." (*Id.* at 130.) The IEP

included several accommodations, and "as the year went on, a notable trend was seen in B.S.'s

progress with each quarter." (*Id.* at 130–31.) At an annual IEP meeting, the District determined

that "[g]iven the progress that B.S. had made, the same type of program was [to be] offered . . .

with some minor changes that were appropriate for B.S.'s needs." (*Id.* at 132.) Plaintiffs, however,

refused to consent to the implementation of the proposed IEP and the instant litigation ensued. (*Id.*

at 133.)

The record demonstrates that, throughout B.S.'s time in the District, the District was

accommodating of B.S.'s developmental and educational needs and offered adequate assistance.

The District also provided oversight to ensure that its plans were being implemented. As the Third

Circuit held in *Abington School District*, "[i]t would be wrong to conclude that the . . . District

failed to identify [B.S.] as a challenged student" when it offered him such "substantial

accommodations." 696 F.3d at 252. The Court, therefore, finds that there was no child find

violation and affirms the ALJ's decision on this ground.

## B.     IEP and FAPE Analysis

Next, Plaintiffs argue that once B.S. was classified as a special education student, the

District's IEP was an inadequate program that failed to provide B.S. with a FAPE. (Pls.' Moving

Br. 36–37.) Specifically, Plaintiffs maintain that the IEP failed to adequately address, *inter alia*,

B.S.'s: (1) reading comprehension and fluency issues, (*id.* at 37–38, 41–42 (B.S. struggled to

decode words, understand unfamiliar words, and properly understand "the entire point of a

story")); (2) writing and spelling issues, (*id.* at 38–39 (B.S. had "immature" writing samples and

poor spelling)); (3) poor social skills, (*id.* at 39–41, 46 (B.S. is socially withdrawn and fails to pick

up on social cues, understand other's perspectives, and flexibly think)); (4) poor handwriting, (*id.*

at 42–43 (B.S. suffered from "awkward positioning" and a lack of motor control and core

13

strength)); and (5) "attentional and sensory challenges," (*id.* at 44 (B.S. "presents as a 'fast thinker' who lacks the efficiency to sync up his train of thought with his writing")). Despite these issues and challenges, Plaintiffs note that the District's IEP only "provided for group speech therapy once a week for thirty minutes, [a] social skills group[ twenty] times per year for thirty minutes, and [occupational therapy] one time per month for [thirty] minutes." (*Id.* at 46.) According to Plaintiffs, B.S.'s struggles required individualized instruction and attention, which were not provided. (*Id.*) Furthermore, Plaintiffs argue that B.S.'s gradual and somewhat stagnant progress with the 2017 IEP required revisions and changes in the 2018 IEP. (*Id.* at 47.) Plaintiffs claim that the District again failed to provide these necessary changes. (*Id.* ("Yet the IEP remained the same for 2018-2019.").) Plaintiffs, therefore, assert that the ALJ's determination that the District provided an adequate IEP and FAPE was an error and should be reversed.

"Considering an IEP's appropriateness[, however,] is a question of fact, [and] the [ALJ's] determination should be considered prima facie correct in order to afford the [ALJ] due weight." *C.S. v. Montclair Bd. of Educ.*, No. 16-3294, 2017 WL 4122433, at *5 (D.N.J. Sept. 18, 2017) (citing *Shore Reg'l High Sch. Bd. of Educ. v. P.S. ex rel. P.S.*, 381 F.3d 194, 199 (3d Cir. 2004)); *see also H.M. ex rel. B.M. v. Haddon Heights Bd. of Educ.*, 822 F. Supp. 2d 439, 453–54 (D.N.J. 2011) (noting that because "the ALJ made no factual finding with respect to whether the . . . IEPs provided" a FAPE, the ALJ's determination was not considered prima facie correct). The Court finds nothing in the record to cause it to divert from this presumption.

First, under the IDEA, the District is required to (1) "provide an 'appropriate' IEP, gauged by whether the IEP is 'sufficient to confer some educational benefit[,]'" and (2) "construct a program in the least restrictive educational environment appropriate to the needs of the child." *Carlisle Area Sch. v. Scott P. ex rel. Bess P.*, 62 F.3d 520, 533–34 (3d Cir. 1995) (quoting *Bd. of Educ. v. Rowley*, 458 U.S. 176, 200 (1982)). The District, therefore, was not required to provide

14

"the optimal level of services, or even a level that would confer additional benefits, since the IEP

require[s] . . . only a basic floor of opportunity." *Id.* (internal quotation marks and citation omitted).

Here, the ALJ noted this requirement and correctly concluded that the District's IEP constituted a

FAPE "with the opportunity for meaningful educational benefit and progress appropriate in light

of B.S.'s circumstances[.]" (ALJ Op. 135–36.) In her analysis, the ALJ found the following as

facts:

> As part of [B.S.'s] programming and related services the IEP
> proposed that B.S. receive in-class resource (support) in
> reading/language arts, math, science[,] and social studies. He would
> also receive pull-out supplementary instruction in reading/language
> arts for the same period of time. Additionally, he would receive
> [speech therapy] group once a week for thirty minutes and
> [occupational therapy] for thirty minutes (1x month) and social
> skills group—[thirty] minutes (20x yearly).
>
> In order to prevent regression in B.S.['s] social skills, language
> skills (including pragmatic/social skills), [occupational therapy,]
> and academic skills, the IEP also offered B.S. the ESY program. The
> program included in-class services for reading/language arts, math,
> social skills group and related arts[,] and pull-out services for
> [speech therapy g]roup.
>
> The accommodations and modifications included in the IEP among
> other things included: allowing extra time for task completion;
> allow[ing] typed rather than handwritten response; use of daily
> routine; frequently checking for understanding; modeling; small
> group instruction; directions repeated, clarified[,] or reworded;
> read[ing] directions aloud; us[ing] interest to increase motivation;
> additional time to complete classroom tests/quizzes; modified
> tests/quizzes; allow[ing] typed rather than handwritten responses;
> preferential seating; arrang[ing] private signal to cue student to
> off-task behavior; provid[ing] short breaks to focus attention;
> edit[ing] written work with teacher guidance; us[ing] social skills
> group to teach skills and provide feedback; use of [Chromebook] for
> all writing tasks within the classroom; [and the] availability of
> speech-to-text on the Chromebook for all writing tasks within the
> classroom.

(ALJ Op. 130–31 (citations omitted).)

The Court cannot find that such extensive accommodations do not confer *some* educational benefit upon B.S. Accordingly, the Court finds that the District's 2017 IEP and its 2018 proposed IEP were appropriate and provided B.S. with a FAPE. The Court, therefore, affirms the ALJ's decision in this ground.[3]

C.     **Plaintiffs' Additional Arguments**

Plaintiffs also argue that (1) they were reasonable in placing B.S. at the Flex School and, therefore, should be reimbursed for the costs associated with the placement, (*see generally* Pls.' Moving Br. 58–64), and (2) the ALJ erred in discounting the credibility of Plaintiffs' witnesses, whose testimonies should have established that the District failed to provide B.S. with a FAPE, (*see generally id.* at 48–58).

First, "[the] IDEA gives the courts authority to grant appropriate relief, including the reimbursement of parents for the cost of a private school placement when (i) the school district had failed to provide the child with an appropriate IEP and (ii) the private placement would meet the child's needs." *Montclair*, 2017 WL 4122433, at *7 (citing *Sch. Comm. v. Dep't of Educ.*, 471 U.S. 359, 370–71 (1985)). As discussed above, however, the Court finds that the District's 2017 IEP and 2018 proposed IEP were appropriate. Accordingly, the first condition for reimbursement cannot be met and Plaintiffs' argument fails.

Second, "if a state administrative agency [in an IDEA case] has heard live testimony and has found the testimony of one witness to be more worthy of belief than the contradictory

---

[3] The ALJ also held that the District's IEPs were offered in the least restrictive environment. (ALJ Op. 136.) Because the IEPs permitted B.S. to remain in general education classrooms, (*id.* at 9–10, 138), B.S. showed progress under the IEP, (*id.* at 132, 138), and the ALJ's findings of fact are considered prima facie correct, *Bayonne*, 602 F.3d at 564, the Court finds that the District offered B.S. the IEPs in the least restrictive environment. *See* 20 U.S.C. § 1412(a)(5)(A) ("To the maximum extent appropriate, children with disabilities . . . are educated with children who are not disabled, and . . . separate schooling . . . occurs only when the nature or severity of the disability of a child is such that education in regular classes . . . cannot be achieved satisfactorily.").

16

testimony of another witness, that determination is due special weight." *Shore Reg'l*, 381 F.3d at 199 (citation omitted). "Specifically, this means that a [d]istrict [c]ourt must accept the state agency's credibility determinations unless the *non-testimonial, extrinsic evidence* in the record would justify a contrary conclusion." *Id.* (emphasis added) (internal quotation marks and citation omitted). Here, Plaintiffs' argument is based on testimonial evidence. (*See, e.g.*, Pls.' Moving Br. 52 ("[The District's] own expert, Ms. Berger, did nothing to undermine the credible testimony and findings of Ms. Elleseff. In fact, she agreed with most of Ms. Elleseff's conclusions."); *see generally id.* 48–58.) Plaintiffs' argument, therefore, cannot overcome the deference afforded to the ALJ's determinations and, accordingly, fails.

## IV.  CONCLUSION

For the reasons set forth above, the Court will affirm the ALJ's decision. The District's Motion for Summary Judgment is granted, and Plaintiffs' Motion for Summary Judgment is denied.


MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

17